**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

GRACIE BENNETT, et al.

                Plaintiffs,

v.                                    CIVIL ACTION NO.  2:10-cv-01201

LENDING SOLUTIONS INC., et al.

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendants' Motion to Dismiss the Complaint [Docket 6].  For the reasons that follow, the motion is **GRANTED IN PART** and **DENIED IN PART**.

*I.  FACTUAL BACKGROUND & PROCEDURAL HISTORY*

The plaintiffs in this case are Lisa A. McMillion and her mother, Gracie Bennett (together "Plaintiffs").  Plaintiffs are residents of Shady Springs, West Virginia, who allege they were solicited to enter a high-interest loan through unconscionable, negligent, and fraudulent conduct by the defendants.  The defendants are: Lending Solutions, Inc. ("LSI"), alleged to be the lender and broker for the transaction at issue; Flagstar Bank, F.S.B. ("Flagstar"), alleged to be the servicer of the loan at issue; United Lender Services Corporation ("ULSC"), alleged to have been the closing agent for the transaction at issue; Wesley Wood, an individual alleged to have conducted the closing personally as an agent for Defendant ULSC; and a named, unknown holder of the loan at issue.

This case arises out of a consumer loan entered into by Plaintiff McMillion and Defendant LSI and secured with real property owned by the plaintiffs.  The property used to secure the loan at issue is located at 384 Glade Street in Shady Springs, West Virginia.  Plaintiff Bennett and her

late husband purchased the property in late 1993, and it was titled to both Plaintiffs and Mr. Bennett as joint tenants.  Sometime thereafter, Mr. Bennett died, leaving Plaintiffs as joint tenants.

In May 2008, Plaintiff McMillion responded to a solicitation to consolidate over $75,000 in unsecured debt by entering into a loan agreement with Defendant LSI.  On June 18, 2008, Plaintiff McMillion transferred her interest in the property (less a life estate) to Plaintiff Bennett, so that Plaintiff Bennett was the sole owner of the property.  Then, on July 17, 2008, Plaintiffs transferred titled from Plaintiff Bennett to Plaintiff McMillion via quitclaim deed prepared by Defendant LSI. According to the complaint, "Plaintiffs objected [to the July 17 quitclaim deed] because Plaintiff Gracie Bennett did not want her ownership of the property to be changed."  (Docket 1-2 at 3.) Defendant LSI allegedly responded that the deed would be discarded once the loan was completed and "that the ownership would remain with Plaintiff Gracie Bennett and that there would be no lien on the property." (*Id.*)  Plaintiff Bennett alleges that she was induced to sign the quitclaim deed in reliance on Defendant LSI's representations.  The complaint also states that Defendant LSI falsely indicated on the deed that it was prepared by Plaintiff Bennett.

On August 8, 2008, the loan at issue was closed, allegedly by Defendant Wood acting as closing agent for Defendant ULSC.  (*Id.* at 4.)  The complaint alleges that "Defendant Wood instructed Plaintiff Lisa A. McMillion where to sign and initial the loan closing documents, [sic] but provided little to no explanation nor provided adequate opportunity for Plaintiff Lisa A. McMillion to understand the essential terms of the loan transaction."  (*Id.*)  Plaintiffs further allege that Defendant LSI prepared another quitclaim deed transferring the property back to Plaintiffs Bennett and McMillion as joint owners once the loan closing was complete.  Plaintiffs state that Defendant LSI again misrepresented that the deed was prepared by Plaintiff McMillion.  (*Id.*)  Finally in

conjunction with the closing, the complaint alleges that "Defendant Wood presented Plaintiff Gracie Bennett with a paper to sign and said that he would tear it up once the loan went through, [sic] but provided her no copy." The complaint does not allege what the paper was or of what legal import it may be.

As a result of the loan transaction, a lien was placed against the property, although Plaintiffs allege that Defendant LSI repeatedly assured Plaintiff Bennett that no such lien would issue. (*Id.* at 5.) Plaintiffs further state that the loan was for $82,000 and "was supposed to have paid off several unsecured loans, but in fact [left] Plaintiff Lisa A. McMillion with certain remaining obligations in addition to the loan at issue." (*Id.* at 4.) Plaintiffs also allege that the loan "contained several excessive fees," specifically naming "two separate signing fees of $350 each." Finally, Plaintiffs state that "Plaintiff Gracie Bennet, who had an ownership interest in the subject property, was not provided with any disclosures or documents." (*Id.* at 5.)

Approximately one and a half years after the closing, Plaintiff Bennett attempted to rescind the loan by letter to Defendants LSI and Flagstar. Defendants LSI and Flagstar allegedly took no action upon receiving the letter, and they allegedly "refused to release the security interest and continues [sic] to do so." (*Id.*) On September 7, 2010, Plaintiffs commenced suit in the Circuit Court of Kanawha County, West Virginia, alleging violations of the Truth In Lending Act, 15 U.S.C. § 1635, fraud, unconscionable inducement, and negligence arising out of the loan transaction described above. (Docket 1 at 1.) Defendants removed the case to this Court on October 11, 2010, based on both federal question and diversity jurisdiction. (*Id.* at 3.)

The instant motion was filed by Defendants Flagstar and LSI on October 18, 2010. In the motion, Defendants Flagstar and LSI challenge the sufficiency of the complaint, arguing that the

allegations fail to meet the required level of specificity prescribed in Federal Rules of Civil Procedure 8(a) and 9(b), as well as the Supreme Court's decisions in *Twombly* and *Iqbal*. *See Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Shortly after the motion to dismiss was filed, Plaintiffs voluntarily dismissed their Truth In Lending Act claims (Counts I and II of the complaint). (*See* Docket 10.)

## II.   DISCUSSION

### A.      Applicable Standards

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). This requirement is intended to ensure that the complaint provides "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A plaintiff's demonstration that he is entitled to relief requires "more than labels and conclusions." *Id.* In other words, "a formulaic recitation of the elements of a cause of action will not do." *Id.*; *see also Giarratano v. Johnson*, 521 F.3d 298, 304 (4th Cir. 2008). Nonetheless, the complaint must only contain "[f]actual allegations . . . [sufficient] to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 129 S. Ct. at 1949 (stating that the complaint "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."). All of the facts alleged in the complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to challenge the complaint as "fail[ing] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In ruling on

4

a motion to dismiss under Rule 12(b)(6), the Court must accept the allegations in the complaint as true. *Twombly*, 550 U.S. at 555. Likewise, the Court is required to draw "all reasonable . . . inferences from those facts in the plaintiff's favor." *Edwards v. City of Goldsboro*, 178, F.3d 231, 244 (4th Cir. 1999). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are wholly insufficient. *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555). Therefore, a motion to dismiss under Rule 12(b)(6) should be granted only if, after accepting all well-pleaded *factual* allegations contained in a complaint as true and drawing all reasonable inferences therefrom in the plaintiff's favor, the complaint fails to allege enough facts to state a claim that is plausible on its face. *See Twombly*, 555 U.S. at 555, 570.

> **B.** *Joint Venture/Agency Claim*

Count VII of the complaint alleges that all five defendants were engaged in a joint venture, and therefore, each defendant may be held jointly and severally liable for the actions of the others. (Docket 1-2 at 12.) As relevant to this Count VII, Defendants Flagstar and LSI argue that the complaint contains only "conclusory allegations of joint venture and agency that are completely unsupported by any allegation of actual facts." (Docket 7 at 20.) The Court agrees.

Under West Virginia law, a joint venture "is an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill and knowledge." *Armor v. Lantz*, 535 S.E.2d 737, 742 (W. Va. 2000) (quoting *Price v. Halstead*, 355 S.E.2d 380, 384 (W. Va. 1987)). "[A] joint venture arises out of a contractual relationship between the parties. The contract may be oral or written, express or implied." *Price*,

355 S.E.2d at 384; *accord Sipple v. Starr*, 520 S.E.2d 884, 892 (W. Va. 1999). "[M]embers of a joint venture are . . . jointly and severally liable for all obligations pertaining to the joint venture, and the actions of the joint venture bind the individual co-venturers." *Armor*, 535 S.E.2d. at 742. "In addition, each venturer is liable for the unlawful acts of a co-venturer when the act is committed within the scope of the venture and with the implied consent of the venturer." *Short v. Wells Fargo Bank Minn., N.A.*, 401 F.Supp.2d 549, 563 (S.D. W. Va. 2005); *see also* 46 Am.Jur.2d *Joint Ventures* § 42. The West Virginia Supreme Court of Appeals has identified the "existence of certain 'distinguishing elements or features' essential to the creation of a joint venture." *Armor*, 535 S.E.2d at 743.

> As between the parties, a contract, written or verbal, is essential to create the relation of joint adventurers. . . .  To constitute a joint adventure the parties must combine their property, money, efforts, skill, or knowledge, in some common undertaking of a special or particular nature, but the contributions of the respective parties need not be equal or of the same character.  There must, however, be some contribution by each party of something promotive of the enterprise . . . .  An agreement, express or implied, for the sharing of profits is generally considered essential to the creation of a joint adventure, and it has been held that, at common law, in order to constitute a joint adventure, there must be an agreement to share in both the profits and the losses.  It has also been held, however, that the sharing of losses is not essential, or at least that there need not be a specific agreement to share the losses, and that, if the nature of the undertaking is such that no losses, other than those of time and labor in carrying out the enterprise, are likely to occur, an agreement to divide the profits may suffice to make it a joint adventure, even in the absence of a provision to share the losses.

*Armor*, 535 S.E.2d at 743 (quoting *Pownall v. Cearfoss*, 40 S.E.2d 886, 893-94 (W. Va. 1946) (other citations omitted)).  Another essential ingredient to an allegation of joint venture is control of the joint venture by the participants.  *Id.* at 745; *see also Kline v. Wilmington Fin., Inc.*, No. 2:09-cv-01082, 2010 WL 2698792, at *5 (S.D. W. Va. July 7, 2010).

In their complaint, Plaintiffs simply recite the elements or features of joint venture and agency identified by the West Virginia Supreme Court of Appeals.  Count VII includes assertions that: (1) "[e]ach [d]efendant had an agreement, either written, oral, constructive, or otherwise for a single business enterprise, that is the closing of the sale and financing of the home at issue"; (2) "[e]ach [d]efendant shared in the profits and/or losses"; (3) "[t]he [d]efendants combined their money, skill, and/or knowledge to carry out this business enterprise"; (4) "[e]ach of the acts of the [d]efendants were done in furtherance of a join venture . . . [with a] joint purpose"; (5) general allegations that the lender and holder defendants "exercised a degree of control over the remaining [d]efendants; and (6) general allegations that "the acts of Defendant loan officer were done as agent for the other Defendants, and the acts of the Defendant servicer were done on behalf of the Defendant holder." (Docket 1-2 at 11-12.)  Although the complaint also features a general narrative, there are no factual allegations to support any of these legal conclusions.  There is no factual support for the existence of express or implied agreements to function as a single business enterprise; there are no factual allegations that the defendants engaged in profit sharing; there is no basis in fact for the  allegation that the defendants combined their knowledge or skill or otherwise collaborated to defraud or deceive Plaintiffs; and there is no allegation of agency, aside from the closing agent—Defendant Wood—acting on behalf of his alleged employer, ULSC.  Quite simply, the complaint fails to include any fact in support of its conclusory recitation of the joint venture elements.  This is precisely the kind of baseless recitation of legal elements that Federal Rules of Civil Procedure 8 and 12 are designed to eliminate.  *See Giarratano v. Johnson*, 521 F.3d 298, 304 (4th Cir. 2008) ("[A] formulaic recitation of the elements of a cause of action will not do.").

The Court's conclusion finds support in this district.  In dismissing a joint venture/agency count filed in a similar case, Judge Copenhaver stated:

> Paragraphs 58 through 64 [which are almost verbatim the paragraphs at issue here], set out in Count Six, are bereft of any factual substance. The allegations constitute no " 'more than ... a formulaic recitation of the elements of a cause of action' " that are insufficient to satisfy Rule 8(a)(2).  *Glassman v. Arlington County*, 628 F.3d 140, 146 (4th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555). This ground for dismissal asserted by [the defendant] is thus meritorious.

*Proffitt v. Greenlight Fin. Servs.*, No. 2:09-cv-01180, 2011 WL 1485576, at *5 (S.D. W. Va. Apr. 19, 2011).  The Motion to Dismiss the Complaint [Docket 6] is therefore **GRANTED** as to Count VII.

Once the joint venture/agency count is dismissed, the Court perceives no alternative basis in the complaint for holding Defendant Flagstar liable.  The remaining counts arise out of the loan origination and closing, and they include: negligence by the closing agent; fraud by the lender in preparing loan documents and making false representations about those documents; and unconscionable inducement in the loan transaction by making those false representations.  The only connection between these allegations and Defendant Flagstar is the use by Plaintiffs of the plural "Defendants," and the occasional, factually unsupported claim that "[t]he loan was brought about with the participation of all Defendants." (See Docket 1-2 at 10.)  Without more, the complaint must be **DISMISSED WITHOUT PREJUDICE** in its entirety against Defendant Flagstar, which, based on the complaint's factual allegations, operated simply as the servicer of the loan once it was originated.  *See Croye v. GreenPoint Mortg. Funding, Inc.*, 740 F. Supp. 2d 788, 801 (S.D. W. Va. 2010) (servicer that was uninvolved in loan origination cannot be held liable for allegedly fraudulent acts of lender in loan origination).

C.      *Fraud Claims*

Plaintiffs allege separate fraud claims.   In Count III, Plaintiff Bennett claims that "Defendants" falsely represented to her that her property interests would not be affected by the July 17 quitclaim deed.   Count III further alleges that Defendants then concealed the fact that a security interest was being taken on the property.  (Docket 1-2 at 7.)   In Count V, Plaintiff McMillion claims that "Defendants misrepresented that it [sic] would completely pay off [McMillion's] unsecured debt leaving her with only one low monthly payment."  (*Id.* at 10.)   This was false, according to the complaint, and Plaintiff McMillion retained some debt and monthly payment obligations.   Both Plaintiffs also claim that Defendants fraudulently represented on the loan documents and the July 17 deed that Plaintiffs were the drafters.  (*Id.* at 3, 4, 10.)

In order to establish a claim for fraud in West Virginia, Plaintiffs must prove:

(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it.

*Highmark West Virginia, Inc. v. Jamie*, 655 S.E.2d 509, 515 (W. Va. 2007) (quoting Syl. pt. 1, *Lengyel v. Lint*, 280 S.E.2d 66, 67 (W. Va. 1981) (citations omitted)).

Fraud claims in federal court are governed by Rule 9(b) of the Federal Rules of Civil Procedure.   Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."   To meet this standard, a plaintiff "must, at a minimum, describe the time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."  *United States ex rel. Wilson v. Kellog Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (internal

9

quotations marks omitted)); *see also* 5 Wright and Miller, Federal Practice and Procedure: Civil §
1297, at 590 (2d ed. 1990) (Rule 9(b) requires a plaintiff to plead with particularity "the time, place,
and contents of the false representations, as well as the identity of the person making the
misrepresentation and what he obtained thereby."). These facts are often referred to as the who,
what, when, where, and how of the alleged fraud. Rule 9(b) serves four purposes: (1) to ensure the
defendant has enough information to formulate a defense; (2) to protect defendants from frivolous
suits; (3) to eliminate fraud actions in which all the facts are learned after discovery; and (4) to
protect defendants from harm to their goodwill and reputation. *See Harrison*, 176 F.3d at 784.

Both claims of fraud based on the misrepresentations that Plaintiffs drafted certain
documents fail to state a claim upon which relief may be granted. As Defendants Flagstar and LSI
point out, it is unapparent how the Plaintiffs were possibly misled by the appearance of their names
as drafters of the documents. Quite simply, Plaintiffs knew they did not prepare the documents
when they signed them. Plaintiffs come forward with no facts to allege how the misrepresentations
were material or reasonably relied upon, either.

In addition, the complaint fails to identify an individual or defendant that guaranteed all of
Plaintiff McMillion's unsecured debts would be paid off. The complaint additionally fails to
identify what debts were to be satisfied by the loan and what debts actually were so satisfied, if any.
 In short, the complaint states that someone said they were going to pay off some undisclosed debts
but failed to do so. Such vague allegations probably fail to meet Rule 8(a)(2)'s plausibility standard,
and they certainly fail to meet Rule 9(b)'s heightened fraud pleading standard.

The only remaining allegation to support a fraud claim is that Defendant LSI falsely assured
Plaintiff Bennett that no lien would be taken against the property. As to the final fraud claim,

Defendants Flagstar and LSI argue: (1) the claim is insufficiently pled because no individual is named as having made the fraudulent statements; and (2) Plaintiff Bennett was not justified in relying on the representation that a deed would not alter her ownership interest in the property.  As opposed to the other counts of the complaint, Count III names a particular defendant, LSI, as the source of the allegedly fraudulent statements.  This count is therefore more particular than the other fraud allegations, which simply attribute the fraud to the "Defendants."   In sum, the facts alleged are that sometime after receiving the July 17 deed to sign, Plaintiff Bennett expressed concern that her property interest might be diminished; and at that time, an agent or employee of LSI assured Plaintiff Bennett that her property interest would not be altered and that the deed would be destroyed after the loan was completed. The Court concludes that such allegations, when taken in the light most favorable to Plaintiffs, plead with sufficient particularity "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."

Defendants Flagstar and LSI also argue that "any reliance on [the alleged] misrepresentations was not reasonable as a matter of law" because (1) it flies in the face of common sense to argue that a deed will not alter ownership interests and Plaintiff Bennett herself questioned the deed's effect; and (2) it is manifestly unreasonable to claim that Plaintiffs were ignorant of the deed's effect given their experience with transferring title to the property at issue.  (Docket 7 at 10-12.)  Again, taking the allegations of the complaint in the light most favorable to Plaintiffs, the Court cannot conclude that it was manifestly unreasonable to rely on Defendant LSI's representation that no lien would be placed on the property.  Defendants Flagstar and LSI's Motion to Dismiss the Complaint [Docket 6] is **GRANTED** as to Count V and **DENIED** as to Count III.

11

D.        *Unconscionable Inducement Claim*

Count IV of the complaint alleges that the loan transaction was procedurally unconscionable and seeks damages on that basis.  (Docket 1-2 at 9-10.)  Defendants Flagstar and LSI seek to dismiss Count IV by arguing that no factual allegations exist to support the claim.  (Docket 7 at 13-14.)

In West Virginia, the basic test for unconscionability is:

> [W]hether, in the light of the background and setting of the market, the needs of the particular trade or case, and the condition of the particular parties to the conduct or contract, the conduct involved is, or the contract or clauses involved are so one sided as to be unconscionable under the circumstances existing at the time the conduct occurs or is threatened or at the time of the making of the contract.

*Arnold v. United Cos. Lending Corp.*, 511 S.E.2d 854, 860 (W. Va. 1998) (quoting Uniform Consumer Credit Code, § 5.108 cmt. 3, 7A U.L.A. 170 (1974)).  West Virginia Code § 46A-2-121 provides the remedy for consumers who have entered into consumer loans either containing unconscionable terms or induced by allegedly unconscionable conduct.  It states, in pertinent part:

> (1) With respect to a transaction which is or gives rise to a consumer credit sale, consumer lease or consumer loan, if the court as a matter of law finds:
>
>> (a) The agreement or transaction to have been unconscionable at the time it was made, or to have been induced by unconscionable conduct, the court may refuse to enforce the agreement, or
>>
>> (b) Any term or part of the agreement or transaction to have been unconscionable at the time it was made, the court may refuse to enforce the agreement, or may enforce the remainder of the agreement without the unconscionable term or part, or may so limit the application of an unconscionable term or part as to avoid any unconscionable result.
>
> (2) If it is claimed or appears to the court that the agreement or transaction or any term or part thereof may be unconscionable, the parties shall be afforded a reasonable opportunity to present evidence as to its setting, purpose and effect to aid the court in making its determination.

W. Va. Code § 46A-2-121.  "Whether a particular term in a contract is unconscionable often depends on the circumstances in which the contract was executed or the fairness of the contract as a whole, and therefore [the] analysis necessarily includes an inquiry beyond the face of the contract." *Troy Mining Corp. v. Itmann Coal Co.*, 346 S.E.2d 749, 753 (W. Va. 1986).  West Virginia courts further instruct that the unconscionability determination "must focus on the relative positions of the parties, the adequacy of the bargaining positions, and the meaningful alternatives available" to the plaintiff.  *Art's Flower Shop, Inc. v. Chesapeake & Potomac Tel. Co.*, 413 S.E.2d 670, 675 (W. Va. 1991); *see also Hager v. Am. Gen. Fin., Inc.*, 37 F. Supp. 2d 778, 786 (S.D. W. Va. 1999).  However, it is fundamental that:

> [a] bargain is not unconscionable merely because the parties to it are unequal in bargaining position, nor even because the inequality results in allocation of risks to the weaker party.  But gross inadequacy in bargaining power, together with terms unreasonably favorable to the stronger party, may confirm indications that the transaction involved elements of deception or compulsion or may show that the weaker party had no meaningful, no real alternative, or did not in fact assent or appear to assent to the unfair terms.

*Troy Mining Corp.*, 346 S.E.2d at 753 (quoting Restatement (Second) of Contracts § 234 cmt. d (1970)).

In considering the sufficiency of this count, the Court must first separate the complaint's well-pleaded factual allegations from its legal elements and conclusions.  First, Plaintiff McMillion states that she is "an unsophisticated consumer" who knows little about financial matters.  (Docket 1-2 at 8.)  However, this statement is supported by no facts to indicate how Plaintiff is "unsophisticated," and the statement that she is unsophisticated "about financial matters" adds little.  Furthermore, the complaint itself details several transfers of the property at issue in the months immediately preceding the loan closing.  This activity appears to be an attempt to shelter the

13

property from Plaintiff McMillion's creditors in the case of bankruptcy, and it indicates that Plaintiffs had at least some experience in financial matters implicating the property and debt at issue.

The complaint additionally states that some or all of the defendants failed to provide appropriate disclosures, made misrepresentations in the loan solicitation and application process, made misrepresentations on loan documents, and misrepresented the security involved in the loan. (Docket 1-2 at 9.)   The misrepresentations on loan documents appear to be notations that the documents were prepared by Plaintiffs rather than one or more of the defendants.  As stated previously, it is unclear how such misrepresentations induced the contract, as Plaintiffs surely were aware that they had not, in fact, drafted the loan documents.

The complaint also alleges: (1) that Defendant LSI assured Plaintiffs that their legal interests in the property would not change, although a lien was ultimately placed on the property as a result of the loan agreement; (2) that Plaintiff McMillion was assured her entire unsecured indebtedness (over $75,000) would be satisfied by virtue of the loan, but it was not; and (3) that two $350 signing fees associated with the closing are excessive.  (Docket 1-2 at 3, 7-9.)  Plaintiffs essentially argue that they were tricked into signing the loan contract, which they believed would consolidate and fully pay off Plaintiff McMillion's unsecured debt without placing a lien on the property.

On Count IV, the complaint alleges facts specific enough to withstand scrutiny under *Twombly* and *Iqbal,* and it thereby states a plausible claim for unconscionable inducement. Although the terms of the contract itself are not unconscionable, and the multiple property transfers strongly indicate that a lien was being placed on the property, in the light most favorable to Plaintiffs, their unconscionable inducement allegations survive the motion to dismiss.  Defendants cite to *Troy Mining Corp.* for the proposition that: "A finding that the transaction was flawed,

14

however, still depends on the existence of unfair terms in the contract. A litigant who complains that he was forced to enter into a fair agreement will find no relief on grounds of unconscionability." 346 S.E.2d at 753.   Defendants argue that because the terms of the contract are fair, no unconscionable inducement could have occurred.  (Docket 13 at 11-13.)  However, *Troy Mining Corp.* also holds that "[a]n analysis of whether a contract term is unconscionable necessarily involves an inquiry into the circumstances surrounding the execution of the contract and the fairness of the contract as a whole."  Syl. pt. 3, *Troy Mining Corp.*, 346 S.E.2d 749 (W. Va. 1986).  If Plaintiffs were misled into thinking that the loan would fully discharge Plaintiff McMillion's debts and that it was an unsecured loan, those circumstances may suffice under *Troy Mining Corp*.  Of course securitizing this loan is a reasonable contract term, but if one or more Defendants intentionally misrepresented to Plaintiffs that the loan was unsecured, it may state a claim for unconscionable inducement.  *See McGinnis v. Cayton*, 312 S.E.2d 765, 777 (W. Va. 1984) (procedural unconscionability includes "sharp or deceptive practices (fine print, legalese disclaimers, or boilerplate clauses on the back of contracts, for examples).").

Furthermore, W. Va. Code § 46A-2-121(2) , which is quoted above, indicates that "[u]nconscionability claims should but rarely be determined based on the pleadings alone." *Mallory v. Mortgage Am., Inc.*, 67 F. Supp. 2d 601, 612 (S.D. W. Va. 1999) (citing *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 292 (4th Cir. 1989)).  Instead, when it is claimed that a contract or any clause thereof may be unconscionable, "the parties should be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court."  *Id.*  Against this backdrop, the Court concludes that Plaintiffs have alleged facts sufficient to demonstrate that the

unconscionable conduct claim is plausible on its face.  *See Twombly*, 550 U.S. at 570.  The Motion

to Dismiss the Complaint is **DENIED** as to Count IV.

      *E.*     *Negligence Claim*

      "In order to establish a prima facie case of negligence in West Virginia, a plaintiff must show

that a defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff.

No action will lie without a duty broken." *Jack v. Fritts*, 457 S.E.2d 431, 434–435 (W. Va. 1995)

(quoting Syl. Pt. 1, *Parsley v. Gen. Motors Acceptance Corp.*, 280 S.E.2d 703 (W. Va. 1981)).  West

Virginia precedent holds that duty is a "question of whether the defendant is under any obligation

for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same, to

conform to the legal standard of reasonable conduct in light of the apparent risk." *Robertson v.

LeMaster*, 301 S.E.2d 563, 567 (W. Va. 1983) (quoting W. Prosser, The Law of Torts, § 53 (4th ed.

1971)).  "Whether a person acts negligently is always determined by assessing whether or not the

alleged negligent actor exercised reasonable care under the facts and circumstances of the case, with

reasonable care being that level of care a person of ordinary prudence would take in like

circumstances." Syl. Pt. 4, *Patton v. City of Grafton*, 180 S.E. 267 (W. Va. 1935).   "The

determination of whether a defendant in a particular case owes a duty to the plaintiff is not a factual

question for the jury; rather the determination of whether a plaintiff is owed a duty of care by a

defendant must be rendered by the court as a matter of law."  Syl. Pt. 5, *Aikens v. Debow*, 541 S.E.2d

576 (W. Va. 2000).

      The complaint alleges the following under the negligence count:

55.    Defendant Wood owed a duty of care [to] Plaintiffs to prepare the loan
        documents properly, properly secure the loan and properly conduct the
        closing.

56.    Defendant Wood breached their [sic?] duty of care.

57.     Said Defendant's breach was, at a minimum, negligent.

58.     Said Defendant's breach was the proximate cause of damage to Plaintiffs.

(Docket 1-2 at 11.) There appear to be no facts in support of the allegations that the loan documents were improperly prepared and that the loan was not properly secured. Accordingly, the complaint fails to state a claim of negligence against any Defendant on those bases.

The remaining allegation claims that Defendant Wood breached his duty to properly conduct the closing. In their response brief, Plaintiffs state that Ms. McMillion "was told where to sign without explanation or opportunity to understand the essential terms of the transaction." (Docket 11 at 11.) As Defendants point out, there is no allegation that either Plaintiff asked any questions or expressed unease to the closing agent about consummating the loan at the time of the closing. (Dcoekt 7 at 18.) It appears, then, that Plaintiffs' negligence claim rests on the existence of an affirmative duty for a closing agent to explain the terms of a home loan and to ensure that the borrower understands the essential terms of the transaction. The Court is unable to locate binding authority imposing such an affirmative duty , and Plaintiffs fail to cite any such authority.[1]

Furthermore, even assuming there exists an independent duty to "properly conduct the closing," such duty would follow generic notions of professional negligence, which require a professional to use such skill, prudence, and diligence as other members of his or her profession commonly possess and exercise. *See generally Weaver v. Union Carbide Corp.*, 378 S.E.2d 105, 107 (W. Va. 1989) (discussing professional negligence in the context of a counselor). However, the complaint contains no allegation that it falls below the applicable professional standard to "provide[

---

[1] In their response brief, Plaintiffs claim that "State law makes clear the duty to conduct a professional closing in the context of a home secured loan." (Docket 11 at 11.) Tellingly, there is no citation following this broad assertion.

17

] little to no explanation [of the loan at closing]."  Moreover, there is no factual substance to the

claim that the closing agent failed to "provide[ ] adequate opportunity for [Plaintiff McMillion] to

understand the essential terms of the loan transaction."  In fact, there is no allegation that the closing

was rushed or hurried, or that Plaintiffs were deprived of the opportunity to ask questions or delay

the closing until they had reviewed the paperwork in more detail.  Finally, the complaint alludes to

"a paper" that was presented to Plaintiff Bennett to sign, and which the closing agent stated he

would tear up following the closing.  (Docket 1-2 at 4.)  There is no further allegation as to what the

paper might be, or of what legal  import Plaintiffs believe it to be.  In sum, Plaintiffs have failed to

adequately plead a duty or that the closing agent breached whatever duty may exist assuming,

*arguendo*, that a duty existed.  The Motion to Dismiss the Complaint is therefore **GRANTED** as to

Count VI, and Count VI is **DISMISSED WITHOUT PREJUDICE**.

### III.  CONCLUSION

Defendants Flagstar and LSI's Motion to Dismiss the Complaint [Docket 6] is

**GRANTED IN PART** (as to Counts V, VI, and VII), **DENIED IN PART** (as to Counts III and IV),

and **DENIED AS MOOT** as to Counts I and II.  Accordingly, Counts V, VI, and VII of the

complaint are **DISMISSED WITHOUT PREJUDICE**, and the complaint is **DISMISSED**

**WITHOUT PREJUDICE** in its entirety as to Defendant Flagstar only.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any

unrepresented party.

ENTER:        September 30, 2011

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE